UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

MIRTA SUREN,                                          :
                                                      :
                        Plaintiff,                    :
                                                      :           MEMORANDUM
                                                      :           AND ORDER
          - against -                                 :
                                                      :           07-CV-4439 (JG) (RLM)
METROPOLITAN LIFE INSURANCE            :
COMPANY,                                               :
                                                      :
                        Defendant.                    :
                                                      :
-------------------------------------------------------------- X

A P P E A R A N C E S :

        FRANKEL & NEWFIELD, P.C.
                585 Stewart Avenue, Suite 312
                Garden City, New York 11530
        By:     Jason A. Newfield
                Justin C. Frankel
                Attorneys for Plaintiff

        LESTER SCHWAB KATZ & DWYER, LLP
                120 Broadway
                New York, New York 10271-0071
        By:     Allan M. Marcus
                Attorneys for Defendant

JOHN GLEESON, United States District Judge:

          Plaintiff Mirta Suren filed this action against defendant Metropolitan Life Insurance

Company ("MetLife"), alleging that MetLife improperly denied her long term disability benefits in

violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et

seq.* MetLife counterclaimed to recover an overpayment arising out of a retroactive award of

benefits to Suren by the Commissioner of Social Security. Both MetLife and Suren have moved for

summary judgment. For the reasons set forth below, I grant MetLife's motion for summary

judgment on Suren's claim for disability benefits and on MetLife's claim for reimbursement of overpayments. Plaintiff's motion for summary judgment is denied.

BACKGROUND

A.    *The Plan*

Lehman Brothers Holdings, Inc. established and maintains the Lehman Group Benefits Plan to provide long-term disability ("LTD") benefits to its eligible employees. Def.'s Ex. B, ML 330-52.[1]  That long term disability plan is referred to here as "the Plan." The Plan is governed by ERISA, and MetLife both administers the claims and funds the Plan benefits. ML 338, 346. MetLife has the "discretionary authority to make all decisions in connection with the administration of the [Plan], including, but not limited to, decisions concerning . . . any benefits to which a participant or beneficiary is entitled." ML 348; *see also* ML 325 ("In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.").  As plan administrator, MetLife is the final authority concerning the Plan. ML 348.

The Plan provides that to be eligible for LTD benefits, a participant must be unable "to perform all the essential duties of [her] occupation." ML 340. Furthermore, to be considered disabled, the claimant must be receiving "appropriate care and treatment from a doctor on a continuing basis" and must be unable to earn more than 80% of her pre-disability earnings at her original occupation. This loss of earnings must be a direct result of the claimant's condition. ML 288.

---

[1]    "ML __" refers to the page numbers of documents in the exhibits attached to MetLife's notice of motion.  The exhibits are the claim file (Exhibit A, ML 1-263), the relevant portions of the Plan's Summary Plan Description (Exhibit B, ML 330-52), and the Plan itself (Exhibit C, ML 264-329).

To obtain benefits, the Plan requires the claimant to submit proof of disability to MetLife. MetLife then determines whether the claimant qualifies for LTD benefits, and if so, for how long. ML 340-44. MetLife also makes the final determination of a claimant's appeal. In determining disability benefits on appeal, MetLife is obligated to consider all comments, documents, records and other information submitted by the claimant. 29 C.F.R. § 2560.503-1.

The Plan provides that monthly LTD benefits are to be reduced by other disability income received by the claimant, including Social Security Disability Income ("SSDI benefits"). ML 342. Any overpayment of LTD benefits due to retroactive receipt of SSDI or other disability benefits must be refunded to MetLife. ML 294.

B.      *Suren's Alleged Disability*

Suren, 50, was employed by Lehman as an administrative coordinator. This position was a sedentary position, though the job did require her to occasionally stand, walk, bend, and kneel. ML 9, 12.[2] Suren stopped working on February 4, 2005 because she claimed to be disabled after she was diagnosed with hepatitis and autoimmune disease with fatigue. ML 3-4, 246-47. Suren and MetLife dispute the date of the onset of disability.

In March 2005, Suren applied for disability benefits. ML 1. In support of her claim, she submitted evaluations conducted by two doctors: Dr. Babu Duddempudi, an internist, and Dr. Placido Morano, a rheumotologist. According to Duddempudi, Suren was hospitalized from February 4, 2005 through February 16, 2005, but would be ready to return to work by April 15, 2005.[3] ML 247.

---

[2]      Plaintiff states that Suren's occupation cannot properly be classified solely in terms of physical requirements, and that the claim file lacks a job description. However, the file indeed contains the description set forth in the text, which is consistent with Suren's own description of her position. *See* Transcript of July 11, 2008 oral argument, at 36-39.

[3]      Plaintiff states that although Duddempudi indicated an expected return date to work, he did not recommend that she actually return to work. Pl.'s Rule 56.1 Counter-Statement, ¶ E.

Laboratory tests from February 2, 2005 indicate that Suren had high alkaline phosphates, high GGT, high AST, high ALT, high LD, low iron, and a low platelet count.[4]  ML 242-43.  A urinalysis indicated high specific gravity, high squamous epithelial cells, and trace leukocyte esterbase.  ML 242-44.  Suren's ANA screen was positive.  ML 245.  An MRI of the brain conducted on February 8, 2005 revealed "[r]ight frontal lobe developmental venous anomaly" and "[n]onspecific frontal deep white matter signal abnormalities."  ML 226.  The MRI was normal in all other respects, and the effect of the MRI's abnormal findings upon Suren's functional capacity was not evaluated or explained.  Laboratory data from February 14, 2005 indicated the presence of RNP antibodies.  ML 241.  None of Suren's doctors have addressed the significance of these laboratory tests.

On March 8, 2005, Suren was examined by Dr. Morano, who indicated that Suren suffered from autoimmune hepatitis with fatigue and arthralgia[5] and concluded that Suren was "unable to function well with daily physical activities."  ML 225.

In a report dated April 19, 2005, Dr. Duddempudi indicated that Suren was incapacitated and could not perform work of any kind.  ML 249.  In May 2005, Duddempudi concluded that Suren had suffered a significant loss of psychological, physiological, personal and social adjustment skills.   ML 221.  He diagnosed her with autoimmune disease, hepatitis and hypothyroidism with symptoms of general weakness and difficulty walking.  ML 220.   As for physical limitations, he noted that Suren was able to sit and stand for only two hours intermittently, walk for one hour intermittently, and lift up to 20 pounds occasionally.  She could not climb, twist, bend, stoop, reach above her shoulder level, or operate a motor vehicle.  ML 221.

---

[4]        Plaintiff suggests that this information is helpful to her, Pl.'s Rule 56.1 Counter-statement ¶ 14, but no doctor references it and there is no explanation of what these terms signify.
[5]        Arthralgia refers to pain in the joints.  MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=2343.

On June 14, 2005, MetLife approved Suren's claim for short-term disability benefits through August 2005 (the maximum duration for such benefits) based on her documentation of hepatitis and severe fatigue. ML 12. After satisfying the Elimination Period of 180 days, MetLife reviewed the medical evidence and approved Suren for LTD benefits through November 3, 2005, to commence on August 3, 2005. ML 12, 215-217.

On July 23, 2005, Suren stated in her personal profile evaluation that she suffered from Lupus[6], a blood clot in her right lung, depression, a thyroid problem, headaches, muscle pain, forgetfulness, dizziness, weakness, and difficulty breathing and sleeping. ML 205-210. She also stated that she was unable to care for her personal needs due to severe muscle pain, and required assistance from her husband for simple activities like getting dressed and bathing. She stated that she could no longer perform any household chores due to her weakness, joint and muscle pain, dizziness, and headaches. Her fatigue and inability to concentrate prevented her from driving. ML 208. MetLife received a psychiatric evaluation dated July 19, 2005 from Suren's psychiatrist, Dr. Sudharam Idupuganti, diagnosing her with "major depression, single episode, severe with melancholia" based on her symptoms of insomnia, anxiety, impaired concentration and memory and sad feelings. ML 15. Idupuganti had been treating Suren with psychotherapy for about two months, and he had prescribed her anti-depressant medications.

After approving Suren's LTD claim, MetLife periodically requested additional updated information, including office notes and test results from her treating physicians. ML 183, 162-63. In compliance with these requests, in September and October 2005, Suren submitted supplemental reports from Dr. Duddempudi and Dr. Miran Salgado, a neurologist, as well as EMG and nerve conduction studies ("NCS") and a radiology exam. In his October report, Duddempudi

---

[6]    Lupus is a chronic inflammatory condition caused by an autoimmune disease. MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=8064.

listed a primary diagnosis of pulmonary embolism and a secondary diagnosis of hypothyroidism. ML 167-71. He indicated that Suren could not work due to "general weakness" and Lupus. Salgado examined Suren on October 10, 2005, and he reported that Suren was alert and oriented and that her "recall and past memory were well-preserved." He also indicated that the Lupus diagnosis was questionable. Salgado noted that although Suren complained of fatigue and muscle weakness, on examination she had normal muscle tone and there was no evidence of "fatigueability or weakness on exertion." He suggested that she had myasthenia gravis[7] or myasthenia syndrome with "probable psychogenic[8] overlay" and recommended further testing. ML 159-60.

On October 11, 2005, a walk-up review of Suren's claim was held to determine whether her benefits would be extended. The nurse concluded that the medical information supported an extension through November 30, 2005. ML 17. The nurse indicated that additional medical information was needed for further benefits, as office visit notes suggested that Suren's pulmonary embolism was resolving and it was unclear what would continue to keep her out of work. ML 17.

An EMG study performed on October 17, 2005 revealed no evidence of polyneuropathy.[9] The study was suggestive but not diagnostic of a presynaptic neuromuscular joint disorder. ML 156-58. The NCS study findings were normal. ML 158. The radiology exam report dated September 14, 2005 revealed that Suren's pulmonary embolism condition had been resolved. ML 144. However, the exam revealed the presence of stable ill-defined nodular opacities in the lateral right middle lobe with tree-in-bud appearance. This finding was "suggestive of an indolent

---

[7]      Myasthenia Gravis is an autoimmune neuromuscular disorder characterized by fatigue and exhaustion of muscles. MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=4473.
[8]      Pyschogenic overlays refers to a condition being caused by the mind or the emotions. MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=5108.
[9]      Polyneuropathy refers to the simultaneous malfunction of nerves. MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=34030.

infectious/inflammatory process, such as bronchiolitis, endobronchial tuberculosis, or atypical infection" for which a clinical correlation was recommended. ML 145.

In a letter dated January 9, 2006, MetLife informed Suren that her LTD benefits were terminated effective December 20, 2005 due to insufficient medical evidence of continued disability. ML 146-148.[10] A nurse consultant retained by MetLife had reviewed Suren's file and concluded that the medical records showed that Suren's pulmonary and liver conditions had resolved and that, other than subjective complaints of fatigue and weakness, there was no medical evidence to support continued functional impairments such that Suren could not perform her job. ML 21-22. Suren contests the reliability of the nurse's opinion and questions her qualifications. Furthermore, Suren states that the nurse's opinion was not valid because it was contrary to the opinions of Suren's treating doctors, Pl.'s Rule 56.1 Counter-statement ¶ O, and the nurse failed to consider the significant psychological impairments that Dr. Idupuganti had outlined in his June 2005 evaluation. ML 193. MetLife contends that since Idupuganti evaluated Suren over six months before the nurse's review, his evaluation would not have provided recent information about improvements in Suren's physical condition. Def.'s Rule 56.1 Response 57.

MetLife's January 9, 2006 letter notified Suren of her right to appeal the termination of her LTD benefits. ML 146-148. The letter advised Suren to send a written request for appeal within 180 days, and asked that she include in the appeal letter the reasons she believed the termination was improper and "any additional comments, documents, records or other information relating to your claim that you deem appropriate." ML 148.

---

[10] MetLife had originally notified Suren by letter dated December 20, 2005 that her LTD benefits would be terminated because she had not provided the information required to continue with disability benefits. ML 143. That letter erroneously stated that Suren's claim was being closed as of August 2, 2007. On December 29, 2005, Suren provided additional medical information. *See* ML 21.

C.    *Social Security Benefits*

On August 9, 2005, Suren's attorney requested that MetLife provide the files on record with MetLife concerning her conditions and disabilities so that she could file a claim for Social Security Benefits.  ML 214.  The Plan required Suren to file a Social Security claim.  ML 293.  The Commissioner of Social Security awarded Suren benefits on November 11, 2005, effective August 2005, in the amount of $1,600 a month.  As part of her application for LTD benefits, Suren had signed a reimbursement agreement, agreeing to refund to MetLife any retroactive LTD benefits that she might receive from other disability benefit providers.  ML 197.

D.    *Suren's Appeal*

In a letter dated January 3, 2006, Suren expressed her desire to appeal MetLife's determination to terminate her LTD benefits.  ML 139.  She attached some receipts of payments to medical providers to her letter and stated that Dr. Duddempudi would provide further documentation.  On February 7, 2006, she forwarded to MetLife the Social Security disability benefits award letter dated November 11, 2005, which had awarded her benefits effective August 2005.   The letter did not include any medical information or findings on which the award was based.  ML 136-37.  After not hearing from MetLife regarding her appeal, Suren contacted MetLife on February 22, 2006 to let it know that she had sent in all of her information.  ML 24.

MetLife referred the claim file for evaluation by two independent physician consultants ("IPC") to obtain their expert medical opinions:  Dr. Leonard Kessler, a psychiatrist, and Dr. Robert Petrie, a physician specializing in occupational medicine.  Though neither doctor is a MetLife employee, they work for NMR/Elite Physicians, a group that earns significant fees from MetLife.  The reports were based solely on review of the medical records; neither doctor examined

Suren.  Petrie attempted to get in contact with Dr. Duddempudi, but Suren's doctor failed to return his phone call.  ML 117.

Dr. Kessler reported that the medical documentation was "insufficient to sustain the presence of a psychiatric disorder beyond [December 20, 2005]."  ML 122-24.  He noted that (1) there was no documentation of psychiatric treatment beyond December 2005; (2) the neurologist, Dr. Salgado, had found on the basis of his October 2005 examination that Suren was mentally alert and well-oriented, with well-preserved memory and recall; and (3) there was no documentation of psychiatric treatment consistent with the presence of a severe psychiatric disorder.  ML 123.

Dr. Petrie concluded that because there was "scanty objective evidence of impairment," Suren should be physically capable of working at a "medium level of employment."  ML 118.  He noted that her liver function had returned to normal levels, that there was no further evidence of autoimmune diseases, and that none of the tests confirmed that she had Lupus.  Furthermore, Petrie relied on Dr. Salgado's assessment that there was no neuromuscular impairment.  He interpreted Salgado's suggestion of possible pyschogenic overlay to signify that Suren's reported symptoms were magnified.  ML 117.  Additionally, he noted that there was no objective medical evidence, lab study or test result that would support a disabling functional impairment.  Finally, Petrie found that there was no indication that Suren's medications had resulted in adverse side effects.  ML 119.

In a letter dated April 21, 2006, MetLife upheld its termination of Suren's LTD benefits effective December 20, 2005.  ML 111-14.  The letter concluded that "[b]ased on the medical information, there is [a] lack of evidence of a severity of a condition that would render you unable to perform your own occupation."  ML 113-14.  It relied on the opinions of the IPCs, the

negative results of the objective medical tests and the neurological exam performed by Suren's own physician, Dr. Salgado, on October 10, 2005.  *Id.*

In May 2006, Suren retained an attorney to pursue her claim further.  Counsel requested copies of the records on which the April 21, 2006 decision was based.  On August 13, 2007, counsel asked for reconsideration of that decision, and provided narrative reports and other medical records in support of the request.  ML 54-55.  Included in this additional information was a chest x-ray dated November 8, 2006, which showed "no evidence for acute pulmonary pathology." ML 65.  Also submitted was a report dated April 25, 2007 from Dr. Idupuganti, reporting that Suren was totally disabled due to a diagnosis of "[m]ajor [d]epression, recurrent episode, severe with melancholia."  ML 57.  He stated that Suren's ability to work had been severely impaired due to her depression as well as to physical illnesses.  *Id*.  He further stated that he had not treated Suren from October 13, 2005 to June 13, 2006.  She returned to his care thereafter due to a "relapse of her depression."  ML 56.   The materials submitted by counsel also included an updated report from Dr. Morano, dated June 26, 2007.  He diagnosed Suren with a "[m]ixed [c]onnective [t]issue [d]isease with joint, skin, respiratory and nervous system involvement," and stated that she suffers from fibromyalgia.  He had seen Suren several times after December 2005 because of her complaints of fatigue, pain, and hoarseness.  He opined that Suren could not work.  ML 58-60.

In response, MetLife conducted an optional additional review of Suren's claim.  ML 32-33. The entire medical file, including the new medical information, was referred to two more IPCs for expert medical opinions:  Dr. Reginald Givens, a psychiatrist and neurologist, and Dr. Dennis Payne, a rheumatologist and internist.  ML 46, 49, 50-53.  Though neither is a MetLife employee, both work for NMR/Elite Physicians, which has a lucrative contract with MetLife.  Pl's Rule 56.1 Counter-statement ¶ X.

Dr. Givens concluded in his report dated September 11, 2007 that the diagnosis of depression was correct, but there was no documentation of psychiatric treatment beyond October 2005 and no specific testing of cognitive functions at any time. He also concluded that there was insufficient objective evidence to support a significant functional impairment due to a psychiatric disorder. ML 47-49.

In Dr. Payne's report dated September 11, 2007, he concluded that there was "no evidence of functional limitations from a rheumatology viewpoint." ML 44. He noted that various objective medical tests (x-rays, blood tests, MRI, NCS) were normal. Additionally, he stated that Suren's hepatitis and pulmonary embolism conditions had resolved: "it is the conclusion of this reviewer that mixed connective disease is not producing any impairment including restrictions or limitations in activities." ML 45.

On September 20, 2007, MetLife informed Suren's attorney that after its additional review of Suren's claim, it had concluded that its previous decision to terminate LTD benefits was proper. ML 40-41. The letter advised counsel that no further appeals would be considered.

E.      *Overpayment*

Because of Suren's retroactive award of Social Security disability benefits, there was an overpayment of LTD benefits for the period from August 3 to December 20, 2005 in the amount of $5,830.61. Suren states that MetLife acted improperly by requiring her to apply for such benefits and welcoming the benefits as an offset to her LTD benefits from MetLife yet failing to properly consider the award in evaluating Suren's disability status. Pl.'s Rule 56.1 Counter-statement ¶ AA.

DISCUSSION

A.  *The Summary Judgment Standard of Review*

Under Federal Rule of Civil Procedure 56(c), a moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994) ("[T]he burden is on the moving party to demonstrate that no genuine issue respecting any material fact exists." (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975))).

A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962) (*per curiam*), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)). Therefore, although a court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods. Co.*, 530 U.S. 133, 151 (2000).

However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper when the moving

12

party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223-24 (citations omitted).

B.      *The ERISA Standard*

An administrator's denial of benefits under an ERISA-governed employee benefit plan is reviewed *de novo*, unless the plan grants the administrator discretion to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 249 (2d Cir.1999). If the administrator has such discretion, her decision will be reviewed under an "arbitrary and capricious standard," *id.*, a standard the Second Circuit uses interchangeably with the "abuse of discretion" standard of review. *See, e.g. Sullivan v. LTV Aerospace & Def. Co.*, 82 F.3d 1251, 1255-56 (2d Cir. 1996).

The decision of the plan administrator is an abuse of discretion "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000) (quoting *Pagan v. Nynex Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)); *see also Peterson v. Cont'l Cas. Co.*, 282 F.3d 112, 117 (2d Cir. 2002) ("It is well established that federal courts have a narrow role in reviewing the discretionary acts of ERISA plan administrators.").  "Substantial evidence" is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (quotation marks and citation omitted, brackets and ellipses in original). In making this determination, my inquiry is "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Jordan v. Ret. Comm. of*

*Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995) (quotation marks and citation

omitted).  My review is limited to the administrative record.  *Miller*, 72 F.3d at 1071.

The Supreme Court recently held that a conflict of interest exists when an insurance

company both determines whether an employee is eligible for benefits and pays the benefits.  *Glenn*

*v. Metropolitan Life*, 554 U.S. ___, 128 S. Ct. 2343 (2008).  The Court further held that in

accordance with *Firestone*, the conflict "should 'be weighed as a factor in determining whether there

is an abuse of discretion.'"  *Id.* at 2350 (quoting *Firestone*, 489 U.S. at 115).  The Court elaborated

as follows:

> We do not believe that *Firestone*'s statement implies a change in the
> *standard* of review, say, from deferential to *de novo* review . . . .
> Neither do we believe it necessary or desirable for courts to create
> special burden-of-proof rules, or other special procedural or
> evidentiary rules, focused narrowly upon the evaluator/payor conflict.
> In principle, as we have said, conflicts are but one factor among many
> that a reviewing judge must take into account.

*Id.* at 2350-51.

As for *how* to take MetLife's conflict into account, the Court offered the following:

> We believe that *Firestone* means what the word "factor" implies,
> namely, that when judges review the lawfulness of benefit denials,
> they will often take account of several different considerations of
> which a conflict of interest is one.  This kind of review is no
> stranger to the judicial system.  Not only trust law, but also
> administrative law, can ask judges to determine lawfulness by
> taking account of several different, often case-specific, factors,
> reaching a result by weighing all together. . . .
>
> In such instances, any one factor will act as a tiebreaker when the
> other factors are closely balanced, the degree of closeness
> necessary depending upon the tiebreaking factor's inherent or case-
> specific importance.  The conflict of interest at issue here, for
> example, should prove more important (perhaps of great
> importance) where circumstances suggest a higher likelihood that
> it affected the benefits decision, including, but not limited to, cases
> where an insurance company administrator has a history of biased
> claims administration.

128 S. Ct. at 2351 (citations omitted).

The standard of review here is abuse of discretion. The Plan gives MetLife the discretion to determine whether an applicant for disability benefits meets the standard set forth in the Plan:

> The Plan Administrator has the discretionary authority to make all decisions in connection with the administration of the welfare benefit plans including, but not limited to, decisions concerning the eligibility of any person to participate in the welfare benefit plans and any benefits to which a participant or beneficiary is entitled. The Plan Administrator is the final authority concerning welfare benefit plans.

ML 348.

C. *Suren's Claims*

MetLife's decision to deny Suren her disability benefits was neither clearly erroneous nor unsupported by the facts. The benefits Suren seeks are available only upon a finding that she is unable to perform the duties of her job, as evidenced by her receiving appropriate care from a doctor on a continuing basis and an inability to earn more than 80% of her pre-disability earnings at her original occupation.

Medical tests supported the conclusion that Suren's hepatitis and pulmonary embolism conditions had resolved by December 2005. ML 144-45. Indeed, Dr. Salgado, Suren's own physician, reported that Suren was mentally alert, well-oriented and fluent, and that her recall and past-memory were "well-preserved." Salgado doubted that Suren suffered from Lupus. He addressed Suren's complaints of fatigue and weakness, but his tests revealed that there was no evidence of such fatigue or weakness on exertion. ML 159-60.

In addition to the opinion of Suren's own physician, all four of MetLife's consultant physicians arrived at the same conclusion after reviewing Suren's case file. Dr. Kessler found that the medical documentation was "insufficient to sustain the presence of a psychiatric disorder" after

December 20, 2005, for Suren had ceased psychiatric treatment by October 2005. ML 122-24. Kessler found this fact inconsistent with complaints of serious psychiatric injury. Dr. Petrie reviewed Suren's case file and found no objective medical evidence of Suren's inability to return to work. Indeed, he noted that the medical evidence supported the view that Suren's hepatitis and pulmonary embolism had resolved. Furthermore, there was no objective medical evidence of any function-impairing neurological or rheumatological disorder. Dr. Givens likewise stated that Suren's hiatus from psychiatric treatment beginning in October 2005 called into question her claim of psychiatric illness as well as the reliability of her psychiatrist's diagnosis. And the statement by Dr. Idupuganti, Suren's treating psychiatrist, that he had not treated Suren from October 10, 2005 to June 13, 2006, undermines his conclusion that she was impaired by depression during that period. Dr. Payne noted that there was no evidence of functional limitations from a rheumatology viewpoint, and that the mixed connective disease did not produce impairment. Finally, many objective medical tests were normal after October 2005.

Although Suren submitted documentation from treating physicians who found her disabled based on illnesses in February 2005, "the mere existence of conflicting evidence does not render [MetLife's] decision arbitrary or capricious." *Rosario v. Local 32B-32J*, 2001 WL 930234, at *4 (S.D.N.Y. Aug. 16, 2001). Moreover, ERISA does not require the plan administrator to accord deference to a treating physician's conclusions. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833-34 (2003). Finally, it is not an abuse of discretion for claim administrators to credit the opinions of independent reviewing physicians. *See, e.g., Scannell v. Metropolitan Life Ins. Co.*, No. 03-cv-990, 2003 WL 22722954, at *5 (S.D.N.Y. Nov. 18, 2003).

In short, the Plan afforded MetLife the discretion to weigh different medical opinions and to determine, based on the evidence submitted, whether Suren is physically able to work. In its

exercise of that discretion, MetLife permissibly relied on the IPCs' conclusions that Suren was not disabled within the meaning of the Plan.

Suren argues that she was denied a full and fair review of her claim in accordance with 29 C.F.R. § 2560.503-1 because the adverse determination conveyed on December 20, 2005 and again on January 9, 2006 failed to advise Suren which additional material was necessary for her to pursue her appeal. I disagree. Plaintiff cites subsection (g)(1)(iii) of that regulation, which requires the notification of adverse determination to "set forth, in a manner calculated to be understood by the claimant . . . [a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(1)(iii).

In its January 9, 2006 letter, MetLife informed Suren of her need to send a written appeal request and asked her to include the reasons for her claim that the decision was wrong and any other comments, documents, records or information in support of her claim. Since that notice followed a detailed explanation of the reasons for the adverse determination, Suren was fairly apprised of what she needed to do (and why) in order to perfect her appeal. At the very least, MetLife substantially complied with ERISA's procedural requirements; accordingly, Suren's claim that MetLife did not afford her a full and fair review is without merit. *See, e.g. Cook v. N.Y. Times Co. Long-Term Disability Plan*, No. 02-cv-9145 (GEL), 2004 WL 203111, at *3 (S.D.N.Y. Jan. 30, 2004) ("[T]he Second Circuit has indicated that 'substantial compliance' with the regulations may suffice to meet § 1133's mandate of full and fair review, even when an individual communication from the administrator does not strictly meet those requirements."). In any event, even if there were procedural shortcomings with respect to the first appeal, any such deficiencies were rendered harmless by the provision of a second appeal at a time when Suren was represented by counsel.

Suren argues that MetLife ignored the opinions of Suren's treating physicians, and instead relied upon the selective review of medical records by biased and unqualified doctors to affirm the prior termination of benefits. I disagree. MetLife took account the opinions of Suren's doctors, as evidenced by the lengthy adverse notification letters, and also had two sets of independent physicians review the record.

Suren also contends that MetLife ignored the determination of disability made by the Social Security Administrator even as it accepted the financial benefit of the Plan's offset provisions. It is true that the better course for MetLife would have been to explain the difference between its outcome and that of the Commissioner of Social Security, and one would hope (and perhaps expect) its post-*Glenn* decisions will do so. There are a number of possible explanations. Perhaps it just disagreed with the decision to award Social Security disability benefits. Perhaps it was because MetLife, unlike the Commissioner of Social Security, is not required to give controlling weight to Suren's treating physicians. Maybe MetLife's benefits decisions were not inconsistent with the Commissioner's at all; both determined that Suren was disabled commencing in February 2005, and the adverse decision at issue in this case was initially made in December 2005, after time had passed and more physicians had examined Suren. Unfortunately, however, MetLife's reference to the fact that it received (and presumably reviewed) the Social Security Award Notice, ML 111, is opaque, so we do not know the reason. Regrettable though that is, in my view it does not counsel in favor of a finding that MetLife abused its discretion. In light of all the medical evidence in the record, and of the fact that all of the information was provided to the four physicians whose opinions support MetLife's decision, I cannot responsibly find that decision to be without reason, unsupported by substantial evidence or contrary to law.

Suren's claim that MetLife failed to afford her a full and fair review because it selectively reviewed and characterized the materials that she submitted to them is unpersuasive. Though she contends that MetLife emphasized Salgado's one-time review that favored the denial of benefits and deemphasized the reports of Dr. Morano and Dr. Idupuganti that supported a contrary result, the record shows that MetLife fairly considered the entire record. Suren's claim was not denied because MetLife emphasized one favorable report and deemphasized others. There is ample evidence other than Salgado's report that supports MetLife's decision, including the fact that Dr. Idupuganti did not treat Suren during the time in question; that objective tests came back negative; and that the reports which support the claim of disability were written earlier in 2005. It is true that Dr. Morano supplemented his initial diagnosis in June 2007 with an additional diagnosis of mixed connective tissue disorder and fibromyalgia, but he did not describe how he arrived at this diagnosis or how this illness would affect Suren's ability to work.

MetLife did not abuse its discretion when it based its opinion on objective tests and examinations, despite Suren's subjective complaints of fatigue and weakness. While the Second Circuit has not squarely addressed the issue of whether objective evidence of disability is required, "several courts in this district have found that it is not unreasonable or arbitrary for a plan administrator to require the plaintiff to produce objective medical evidence of total disability in a claim for disability benefits." *Fitzpatrick v. Bayer Corp.*, No. 04-cv-5134 (RJS), 2008 WL 169318, at *10 (S.D.N.Y. Jan. 17, 2008); *see also Fedderwitz v. MetLife Ins. Co. Inc., Disability Unit*, No. 05-cv10193 (BSJ) (HP), 2007 WL 2846365, at *9 (S.D.N.Y. Sept. 27, 2007) ("Fedderwitz also contends that MetLife's skepticism of some of Fedderwitz's physicians' subjective claims in the absence of objective medical documentation violated the terms of the Plan, by essentially adding new terms to the LTD Plan, to wit, an objective evidence requirement. This argument is unavailing.

. . . . [T]he terms of the Plan expressly require 'satisfactory evidence' of a disability; it is not an unreasonable interpretation of that provision to require objective medical evidence to support subjective claims.") (citations and quotation marks omitted); *Scannell v. Metropolitan Life*, No. 03-cv-990, 2003 WL 22722954, at *5 (S.D.N.Y. Nov. 18, 2003) ("It is not unreasonable for MetLife to require objective evidence as proof of total disability, particularly because MetLife has discretionary authority to interpret the terms of the plan."); *Parisi v. UnumProvident Corp.*, No. 03-cv-1425 (DJS) 2007 WL 4554198, at *14 (D.Conn. Dec. 21, 2007) ("[T]he court finds no reason to give the opinions of Parisi's treating physicians any special weight. Because there was no objective evidence of Parisi's symptoms, the medical assessments of Parisi's doctors were based solely on Parisi's subjective complaints of pain. Such assessments carry little weight in supporting disability claims, and the plan administrator is not required to accept them.").

Suren's arguments that MetLife (1) failed to utilize proper medical professionals; (2) failed to consider non-physical work requirements; and (3) failed to consider co-morbid conditions are similarly unavailing. MetLife's independent physician consultants were each Board-certified in one or more specialty areas that were relevant to Suren's diagnoses and conditions. That they were paid consultants does not disable MetLife from considering their opinions in making benefits decisions. With regard to complaints of fibromyalgia, "it [is] sufficient that doctors trained in internal medicine or occupational medicine were retained to review the Plaintiff's records." *Fitzpatrick*, 2008 WL 169318, at *14.

As for Suren's claim that MetLife failed to perform a vocational analysis and did not consider non-physical work requirements, MetLife has provided sufficient documentation that it considered both her physical and non-physical conditions. The consulting psychiatrist referenced Salgado's report in finding that she was not cognitively impaired. Furthermore, Suren's treating

psychiatrist's failure to consistently treat her or diagnose her with a valid DSM IV diagnosis were factors leading to MetLife's assessment that there was insufficient medical evidence to support the presence of a functional-impairing psychiatric disorder beyond December 20, 2005. Finally, Suren's contention that MetLife's independent physicians failed to consider co-morbid conditions is not supported by the record. Just because the independent physicians were specialists does not mean they ignored other conditions out of their specialty. Indeed, the directive to each of the independent physicians was to "define the claimant's current level of functionality based on your review of all of material provided." ML 126. The records of the physicians, especially of Petrie, Givens, and Payne, demonstrate that they analyzed Suren's record in detail, and took into account the evidence of disability even if it was outside their specialty. ML 43-46, 47-49, 116-121.

D.    *MetLife's Claim to Recover Benefits*

The Plan provides that any LTD benefits payable under the plan must be offset by other disability benefits, including Social Security disability payments. Furthermore, Plan participants must repay any overpayments based on retroactive awards of benefits. ML 294. ERISA protects the administrator's right to obtain equitable relief to enforce the terms of the Plan. 29 U.S.C. § 1132(a)(3)(B); *see, e.g., Aitkins v. Park Place Entertainment Corp. Employee Benefit Plan, et al.*, No. 06-cv-4814 (JFB), 2008 WL 820040, at *24 (E.D.N.Y. March 25, 2008).

Suren signed a Reimbursement Agreement, agreeing to make retroactive payments for benefits paid by the SSA. In November 2005, Suren was awarded benefits by the Social Security Administration retroactive to August 2005. She did not inform MetLife of the award until February 2006. She received an overpayment of LTD benefits in the amount of $5,830, and is obligated to send that amount to MetLife.

CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is granted with respect to both claims. The Clerk is directed to enter judgment for MetLife on Suren's claim. On MetLife's counterclaim, judgment shall be entered for MetLife in the amount of $5,830. Upon entry of judgment, the Clerk is directed to close the case.

So ordered.

John Gleeson, U.S.D.J.

Dated: August 29, 2008
       Brooklyn, New York